UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Pedro Roque, Administrator of the Estate of Edward Roque,<br>    *Plaintiff*,<br><br>    *v.*<br><br>United States of America,<br>    *Defendant.* | Civil No. 3:09cv533 (JBA)<br><br><br><br>December 10, 2009 |

RULING ON DEFENDANT'S MOTION TO DISMISS [Doc. # 13]

Plaintiff Pedro Roque, the father of Edward Roque and the administrator of his estate, brought suit on April 3, 2009 against the United States, raising wrongful death and survival claims under the Federal Tort Claims Act ("FTCA"), based on the Government's alleged negligence resulting in the assault on and death of Edward Roque on September 2, 2005. The Government has moved to dismiss the action for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) as barred by the two-year statute of limitations. For the reasons that follow, the Government's motion will be denied.

I.     Factual Background and Procedural History

The Complaint [Doc. # 1] alleges the following facts. Edward Roque was an inmate at the United States Penitentiary in Lewisburg, Pa. ("USP Lewisburg"). In early September 2005 Plaintiff received a letter from Joseph V. Smith, then the warden at USP Lewisburg, informing him that his son Edward Roque died on September 2, 2005 "'as a result of asphyxiation,'" and "'the circumstances are currently under investigation.'" (Compl. at ¶ 40a (quoting letter dated Sept. 2d and postmarked Sept. 8th).) On September 20th, "the

Government mailed the Plaintiff a copy of [Edward] Roque's Certificate of Death, . . . which listed the immediate cause of death as '[a]sphyxiation due to neck compression' and described how the injury had occurred as 'choked by another person.'" (*Id.* at ¶ 40b.) The Government provided no additional information. (*Id.*)

On November 2, 2005, Plaintiff filed with the Bureau of Prisons ("BOP") a Freedom of Information Act ("FOIA") request for additional information related to his son's death "[i]n order to learn how his son had died, and to determine whether a claim under the FTCA had accrued." The BOP denied the FOIA request on December 9, 2005. Two weeks later Plaintiff timely appealed to the Department of Justice ("DOJ"), and on February 17, 2007 the DOJ remanded the request to the BOP "'for processing of the responsive records.'" (*Id.* at ¶¶ 40c–f.) On November 13, 2007—nine months later, and only after Plaintiff "complain[ed] to his congressman in writing about the inaction of the [BOP] in processing his FOIA request"—the BOP sent Plaintiff a letter "stating that [it] was prepared to release 412 pages of documents [and] two videocassettes" and requiring pre-payment for the materials, which Plaintiff remitted two days later. The BOP did not produce any documents or videocassettes until January 16, 2008, when it released one of the two videocassettes and 374 pages, 161 of which contained redactions. Two weeks later, on February 4, 2008, Plaintiff received "a DVD containing the releasable portion of the second videocassette." (*Id.* at ¶¶ 40g–k.)

The documents and videos released in January and February 2008 revealed the following. After Edward Roque "was assaulted by another prisoner or prisoners on April 4, 2005," BOP officials[1] "placed [Edward] Roque in the Special Housing Unit of USP Lewisburg." On June 22, 2005, Edward Roque "was assaulted again, this time by two prisoners," one of them named "Salazar," as a result of which a BOP investigator recommended that Edward Roque's "two assailants be transferred to another correctional facility" and that the BOP's Central Inmate Monitoring ("CIM") System require separation of Edward Roque from his two assailants. Pursuant to this recommendation, "[Edward] Roque's CIM assignment was designated 'Separation'" on July 12, 2005 for the inmates' mutual protection. Edward Roque was thereafter returned to USP Lewisburg's general population. (*Id.* at ¶¶ 9–14, 16–18, 38, 42–44.) According to Plaintiff, this designation required that Edward Roque and his assailants be confined in different institutions unless a single institution could "'prevent any physical contact between the separatees.'" (*Id.* at ¶ 15 (quoting 28 C.F.R. § 524.72(f).) Warden Smith extended Edward Roque's CIM "Separation" assignment on August 22, 2005, but the BOP nonetheless "confined Roque in a two-man prison cell with Salazar." (*Id.* at ¶¶ 19–20.)

These documents and videos further revealed certain events that took place early on September 2, 2005. In particular, USP Lewisburg staff conducted an official prisoner count

---

[1] Plaintiff's allegations of "Government" actions contextually refer only to actions of BOP officials and employees.

at 12:01 a.m. At 12:35 a.m. staff responded to Salazar's banging on the door of the cell he shared with Edward Roque. According to Plaintiff, Salazar "subsequently admitted to the Government that he had been in a fight with [Edward] Roque which ended in Salazar cho[k]ing [Edward] Roque to death" in what Salazar described as self-defense. Staff ordered Edward Roque "to submit to hand restraints," and when he failed to comply, they sprayed him with pepper spray, summoned the BOP Use of Force Team, and again sprayed him. "The dying or dead [Edward] Roque was then restrained and dragged out of his cell by the BOP Use of Force Team," and although the team observed that Edward Roque exhibited signs of severe injury or death,[2] neither the team nor other USP Lewisburg staff "responded with[] any medical equipment of any kind," had any "medical equipment of any kind . . . for their use," or "attempted or initiated" any "lifesaving measures of any kind." (Compl. at ¶¶ 21–30, 38, 42–44.) According to Plaintiff, the sequence of events on September 2, 2005 was as follows:

> 12:01 a.m.: official count made.
> 12:35 a.m.: call for assistance by Salazar.
> 12:37 a.m.: Salazar removed from cell.
> 1:04 a.m.: Edward Roque removed from cell; vital signs checked for first time.
> 1:05 a.m.: official time of death, which was assigned after the fact.
> 1:06 a.m.: Edward Roque brought to Health Services.

---

[2] Specifically, Plaintiff alleges that the Use of Force Team observed that Edward Roque was "unresponsive, pulseless, apneic (not breathing) and cyanotic (having blue skin from lack of oxygen)," that "[h]is extremities were cold to the touch, his pupils were dilated and unreactive; his face, lips, ears and forehead were cyanotic; and he had dried blood around his nares (nostrils) and forehead," and that he "had 'minor' abrasions to his anterior (front) left and right neck/throat area." (Compl. at ¶ 29.)

4

>    1:30 a.m.: Union County Coroner paged.
>    1:35 a.m.: Clinical Director arrived at USP Lewisburg.
>    1:50 a.m.: Edward Roque pronounced dead.

(*Id.* at ¶¶ 31–32.)

Approximately 13 months after the January 2008 FOIA production, and based on facts contained in that production, Plaintiff filed an administrative claim for $1.5 million, which the BOP denied on March 6, 2009.  (*Id.* at ¶ 3.)  A month later, Plaintiff brought this action under the FTCA for $1.5 million, alleging that the Government's negligence caused both Edward Roque's wrongful death and the "pain and suffering during the death struggle he endured with his killer and the sheer terror he must have experienced as he struggled with his cellmate, who was choking the life out of him over the course of as much as 34 minutes." (*Id.* at ¶¶ 36a–c.)  His wrongful death claim alleges that the Government breached its duties to Edward Roque in the following ways:

>    a.   Housing and locking [Edward] Roque in a cell with another prisoner who Warden Smith and BOP staff well knew had a history of violence and animosity toward [Edward] Roque[;]
>
>    b.   Housing and locking [Edward] Roque in a cell with another prisoner in direct violation of Warden Smith's own determination that [Edward] Roque required separation from inmate(s) confined in the BOP for their mutual protection, which had resulted in Warden Smith's approval of a CIM classification of "Separation" just 11 days before [Edward] Roque was killed by his cellmate, Salazar[;]
>
>    c.   Providing inadequate surveillance and supervision of [Edward] Roque's cell, and such inadequate supervision and training of the BOP staff, that BOP staff could neither see nor hear the deadly assault on [Edward] Roque by his cellmate until after Salazar had killed [Edward] Roque[;]

5

      d.      Failing to respond to the sights and/or sounds of the deadly assault on [Edward] Roque;

      e.      Failing to make any effort to determine [Edward] Roque's physical condition, <u>i.e.</u>, whether he was injured or in danger of dying, before subduing him with pepper spray and handcuffs;

      f.      Failing to make any effort to check for vital signs and attempt to resuscitate or otherwise provide medical attention to [Edward] Roque upon entering his cell;

      g.      Failing to have any resuscitation or other medical equipment available to the BOP staff who responded to [Edward] Roque's cell, or in the proximity of the cellblock[;]

      h.      Failing to have adequately trained medical personnel available to respond to a life-threatening situation in the cellblock.

(Compl. at ¶ 33.)

II.      Discussion

      A.      Accrual of a Claim, and the Diligence-Discovery Rule

The Government challenges the timeliness of Plaintiff's administrative filing and hence this lawsuit. It asserts that on September 2, 2005 BOP officials both called and wrote a letter to Plaintiff, but does not dispute the Complaint's timeline of Plaintiff's FOIA requests and the Government's replies, or the substance of the documents and videos contained in the January and February 2008 productions. Instead, it argues that because Plaintiff did not file his claim within two years after receipt of the September 2005 BOP communications, this action is time-barred. In pertinent part, the FTCA provides:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency *within two years after such claim accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

6

28 U.S.C. § 2401(b) (emphasis added). The Government argues that Plaintiff's claim accrued, at the latest, when he received the Certificate of Death stating that Edward Roque was choked to death by another person. Plaintiff counters that this information provided nothing about the culpability of BOP personnel in Edward Roque's strangulation, which he first learned in January 2008.

"'Accrual is the date on which the statute of limitations begins to run.'" *Valdez ex rel. Donely v. United States*, 518 F.3d 173, 177 (2d Cir. 2008) (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)). "A claim under the [FTCA] accrues on the date that a plaintiff discovers that he has been injured," unless the "plaintiff would reasonably have had difficulty discerning the *fact* or *cause* of injury at the time it was inflicted," in which case "the so-called 'diligence-discovery rule of accrual' applies." *Donely*, 518 F.3d at 177 (emphases added) (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir. 1998)). "Under this rule, accrual may be postponed until the plaintiff has or with reasonable discovery should have discovered the critical facts of both his *injury* and its *cause.*" *Id.* (quoting *Kronisch*, 150 F.3d at 121); *see also Barrett v. United States*, 689 F.2d 324, 327 (2d Cir. 1982).[3]

---

[3] The Government relies on the Second Circuit's observation in 1982 in *Barrett* that "[t]he diligence-discovery rule of accrual is not often applied outside the medical malpractice area," 689 F.2d at 328, but neither this language in *Barrett*, nor subsequent cases, have limited application of the diligence-discovery rule to medical malpractice cases. Indeed, as the *Barrett* court itself stated, application of the diligence-discovery rule "may be appropriate in non-malpractice cases where plaintiffs face comparable problems in discerning the fact and cause of their injuries," and "any plaintiff who is blamelessly ignorant of the existence

7

The rule focuses not on a plaintiff's recognition of the potential for legal liability of another, but on his knowledge of the facts of what injury occurred and whose actions caused that injury. In other words, the rule protects a plaintiff against "'ignorance of the fact of his injury or its cause,'" but not "'ignorance of his legal rights.'" *Donely*, 518 F.3d at 177 (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979)). In *Kubrick* the Supreme Court emphasized this distinction by explaining that once "armed with the facts about the harm done to him, [he] can protect himself by seeking advice in the medical and legal community. . . . If advised that he has been wronged, he may promptly bring suit. If competently advised to the contrary, he may be dissuaded, as he should be, from pressing a baseless claim." *Kubrick*, 444 U.S. at 122–24. Thus:

> The fact of injury may not manifest itself for some time after the act that caused it and "the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff." By contrast, "[t]he prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter."

*Donely*, 518 F.3d at 177 (quoting *Kubrick*, 444 U.S. at 122); *see also id.* at 178 (quoting *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985)) (emphasis in *Drazan*, alteration in *Donely*) ("'[t]he notice must be not of harm but of iatrogenic [doctor-caused] harm, though, as *Kubrick* holds, not necessarily of *negligent* iatrogenic harm'").

---

or cause of his injury should be accorded the benefits of the more liberal accrual standard." *Id.* At issue in *Cada*, a case on which the Second Circuit relies in *Donely*, was accrual of a claim under the Age Discrimination in Employment Act, not a medical malpractice claim. *Cada*, 920 F.2d at 448.

Because an FTCA case may be brought only against employees of the United States, "the identity of the tortfeasor is a critical element to the accrual of a claim." *Barrett*, 689 F.2d at 330 (internal quotations omitted). Thus, in *Drazan*, which the Second Circuit described as articulating "settled law," *Donely*, 518 F.3d at 177–78, the Seventh Circuit focused on the moment at which a putative FTCA plaintiff learns of the government's involvement in the alleged negligence, *Drazan*, 762 F.2d at 59. The Second Circuit, adopting this analysis, explained the diligence-discovery rule as requiring tolling of the two-year statute of limitations until "'the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered *the government cause*—whichever comes first.'" *Donely*, 518 F.3d at 178 (quoting *Drazan*, 762 F.2d at 59) (emphasis added).[4]

The diligence-discovery rule reflects that for FTCA purposes, a claim accrues when a diligent plaintiff discovers two things: (1) that he has been hurt, and (2) who has inflicted the injury. *See, e.g.*, *Barrett*, 689 F.2d at 330 (calculating date of accrual by application of diligence-discovery rule where "[n]ot only was the 'what' element of the causation inquiry arguably unknown to the plaintiffs until 1975, but the 'who' element was also missing from the puzzle"); *Donely*, 518 F.3d at 177 n.1 (citing *Cada*, 920 F.2d at 450) ("Judge Posner has

---

[4] While the diligence-discovery rule protects a potential plaintiff from his ignorance of facts, it does not excuse him of the responsibility to take reasonable actions to discover the facts on which an FTCA claim could be based. *See generally Kubrick*, 444 U.S. at 122. The Government does not argue that Plaintiff's diligence was deficient in any way.

pointed out that the diligence-discovery rule may alternatively be thought of as the default rule of accrual, as in most cases the plaintiff will discover his injury on the date that it occurs.").

      B.      Accrual of Plaintiff's Cause of Action

"FTCA claims must allege an 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government,'" and "the FTCA only applies in 'circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [tortious] act or omission occurred.'" *Klopp v. United States*, 131 F.3d 131 (Table), 1997 WL 774397, *2 (2d Cir. Dec. 17, 1997) (quoting 28 U.S.C. § 1346(b)(1)); *see also* 28 U.S.C. § 2674 (FTCA holds Government "liable . . . in the same manner and to the same extent as a private individual under like circumstances"); *Peker v. Steglich*, 324 F. App'x 38, 39 (2d Cir. 2009) (quoting *Chen v. United States*, 854 F.2d 622, 626 (2d Cir. 1988); alteration in *Peker*) ("'[A] plaintiff's cause of action must be comparable to a cause of action against a private citizen recognized in the jurisdiction where the tort occurred, and his allegations, taken as true, must satisfy the necessary elements of that comparable state cause of action.'").

In Connecticut, a plaintiff pressing a wrongful death claim "must prove not only a violation of a standard of care as a wrongful act, but also a causal relationship between the injury and the resulting death. . . . A wrongful death cause of action, therefore, requires that the party seeking relief allege an underlying theory of legal fault and that such fault is the

proximate cause of the injury." *Ward v. Greene*, 267 Conn. 539, 546–47 (2004). A wrongful death claim may "sound in negligence," *id.* at 547, as does Plaintiff's claim in this case. To prevail on his claim that the BOP officials were negligent, Plaintiff must prove "[t]he essential elements of a cause of action in negligence" under Connecticut law, which are "duty; breach of that duty; causation; and actual injury." *Jagger v. Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 687 n.13 (2004); *see also Ward*, 267 Conn. at 547 (focusing on existence-of-duty-of-care element in wrongful death claim sounding in negligence).

Here, the essence of the parties' dispute is over whether the September 2005 letter and Certificate of Death contained sufficient information to constitute the date on which Plaintiff's FTCA claims accrued. The Court concludes that they did not. Before Plaintiff filed his FOIA request with the BOP, Plaintiff knew only that his son had been "choked [to death] by another person." Plaintiff did not know any of the circumstances surrounding his son's death, including what actions BOP officials took or failed to take that night. He also knew nothing about who the "[]other person" was, what BOP officials knew about that person or the relationship between him and Edward Roque, or the BOP "separation" classifications of Edward Roque and Salazar. Plaintiff thus did not know any facts on which to base a claim that BOP officials breached any duty to Edward Roque by housing him again with Salazar after their prior confrontations, and relatedly, their level of surveillance or responsiveness to his cell conditions with Salazar, and therefore could not in good faith have alleged any facts sufficient to state a claim of negligence. Even though in September 2005

11

Plaintiff knew the *fact* and immediate medical cause of Edward Roque's death, without the context Plaintiff learned in January 2008 he had no basis to state that the BOP officials were negligent. Indeed, each of Plaintiff's allegations of duties BOP officials owed to and breached as to Edward Roque—including their ignoring the CIM classifications, providing inadequate surveillance, and failing to provide medical equipment to responding prison officials—derives from information Plaintiff obtained in January and February 2008 as a result of his efforts to obtain information from the BOP.

At oral argument the Government conceded that the September 2005 documents did not provide Plaintiff with the identity of the person who choked Edward Roque to death or any information regarding the specific acts or omissions of BOP officials on the night of his death, but it argued that armed with the knowledge that Edward Roque had been choked to death by "another person" while in the custody of federal officials, Plaintiff could immediately have filed a wrongful-death suit under the FTCA by alleging in the alternative that Government employees either wrongfully strangled Edward Roque to death themselves, or wrongfully permitted an inmate to do so because they had a duty to protect the well-being of inmates in their care and custody.

The Government's argument lacks merit. By its telling, notice of a prisoner's death by choking, standing alone, is sufficient to notify the estate administrator that a government actor may have had responsibility in causing the death. But "a 'claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim,'" even if "a plaintiff's

suspicions may 'give rise to a duty to inquire in[to] the possible existence of a claim in the exercise of due diligence.'" *Donely*, 518 F.3d at 178 (quoting *Kronisch*, 150 F.3d at 121). The September 2005 disclosures contained no information whatsoever regarding the acts or omissions of BOP employees, and neither Plaintiff nor his counsel—knowing in September 2005 nothing more than Edward Roque was in federal custody when he was choked to death by another—would have the ability to "certif[y] that to the best of [his] knowledge, information, and belief" either of the alternative theories suggested by the Government "ha[d] evidentiary support or . . . [would] likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). While the Government's proposed two alternative theories of liability available to Plaintiff in September 2005 are *plausible* explanations for the manner of Edward Roque's death, there are other plausible explanations precluding liability under the FTCA, all of which are speculations driven by the bare-bones facts known to the Plaintiff in September 2005. Undoubtedly, Edward Roque's death triggers suspicions, which is precisely why Plaintiff commenced his long-running quest for more information, leading him to uncover in January 2008 the BOP's role.

A plaintiff's choice to plead in the alternative[5] does not eliminate his obligation under Rule 11 to conduct "a reasonable inquiry" into the truth his allegations before pleading them.

---

[5] "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically," Fed. R. Civ. P. 8(d)(2), and "may state as many separate claims or defenses as it has, regardless of consistency," Fed. R. Civ. P. 8(d)(3).

5 Wright and Miller, *Federal Practice and Procedure*, at § 1285 (3d ed. 2004) ("Rule 11 Limitations on Pleading"). This obligation dovetails with the diligence-discovery rule of accrual's requirement that "a reasonably diligent person" ignorant of the cause of his injuries, "reacting to any suspicious circumstances of which he might have been aware," inquire into and "discover the government cause." *Donely*, 518 F.3d at 178 (quoting *Drazan*, 762 F.2d at 59). Plaintiff did not know the relevant facts or circumstances of his son's death on which to base a negligence claim against the BOP, and undertook an inquiry to discover them. Whether construed as the reasonable inquiry Plaintiff was obligated to undertake before pleading in the alternative, or as the duly diligent inquiry contemplated by the diligence-discovery rule of accrual, Plaintiff's efforts to obtain additional information through FOIA about Edward Roque's death constituted the pre-pleading inquiry proper under the circumstances.

Because Plaintiff did not know of the Government employees' acts or omissions in September 2005, he did not at that point know "the 'who' element," *Barrett*, 689 F.2d at 330, of any possible negligence claims. In the language of *Kubrick*, 444 U.S. at 124, in September 2005 Plaintiff could not have "protect[ed] himself by seeking advice in the . . . legal community" because he was not "armed with the facts" necessary for a "competent[]" lawyer to determine whether "he ha[d] been wronged" or whether his would be "a baseless claim." His FTCA claims did not accrue until his diligent attempts to find out finally resulted in his discovery, in January 2008, of the acts and omissions of officials at USP Lewisburg in July,

August, and September 2005.  His FTCA claim is therefore timely, and the Government's argument to the contrary must be rejected.

III.     Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss [Doc. # 13] is DENIED.

>                           IT IS SO ORDERED.
>
>                           ____/s/_____
>                           Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of December, 2009.