UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Pedro Roque, Administrator of the Estate of Edward Roque,<br>         *Plaintiff*,<br><br>                *v.*<br><br>United States of America,<br>         *Defendant*. | Civil No. 3:09cv533 (JBA)<br><br><br><br><br>February 24, 2012 |

RULING ON MOTION FOR SUMMARY JUDGMENT

On April 3, 2009, Plaintiff Pedro Roque ("Plaintiff"), as administrator of the estate of his son Edward Roque ("Roque"), filed a Complaint against Defendant United States of America (the "Government"), bringing a wrongful death and survival claim pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671, *et seq.* ("FTCA"). Plaintiff alleges in his Complaint that the Government's negligence led to an assault on and death of Edward Roque on September 2, 2005 while he was housed at the United States Penitentiary Lewisburg ("USP Lewisburg") in that the Government breached its duty of care to Roque in its decision to cell Roque with the inmate who attacked him, by inadequately supervising Roque's cell, by failing to adequately respond to the assault on Roque by his cellmate, by failing to provide the necessary equipment and training for responses to medical emergencies, and by failing to adequately treat Roque's medical emergency. Defendant moves [Doc. # 54] for summary judgment on all of Plaintiff's claims. For the reasons that follow, the Government's motion for summary judgment will be granted.

I.  Undisputed Facts

    A.  Background

Edward Roque was an inmate at the United States Penitentiary Lewisburg ("USP Lewisburg") beginning on November 17, 2004; he had a history of "assaultive behavior on police and correctional staff." (Lantz Expert Report, Ex. A to Def.'s Loc. R. 56(a)1 Stmt. at 6.) On August 22, 2005, he was classified as a "Central Inmate Monitoring Separation case" and placed in a cell in the Special Housing Unit ("SHU") due to "engagement in assaultive activities with at least two inmates who were not affiliated with Inmate [Joseph Mel] Salazar." (*Id.*) Mr. Roque shared a cell with Mr. Salazar for more than a month prior to being killed by Salazar, from July 29, 2005 to September 2, 2005; the Government's Expert, former Commissioner of the Department of Corrections Theresa Lantz writes in her expert report that "there was no communication of any type to staff, to other inmates, or to other individuals including Roque's family members, that indicated the two inmates were not compatible. There was no written, verbal or observable reason for staff to suspect that there was a conflict between inmates Roque and Salazar prior to September 2, 2005." (*Id.*) Plaintiff agrees with this analysis, but adds that Mr. Salazar and Mr. Roque had "normal" run–ins, "talk[ed] smack," and had a disagreement over a tattoo given to Mr. Roque by Mr. Salazar. (Pl.'s Loc. R. 56(a)2 Stmt. ¶ 8.)

Mr. Salazar testified during his deposition that he and Mr. Roque had a disagreement in January or February of 2005, before they were cellmates, over a tattoo that Salazar had given Roque on his forearm; Roque complained to Salazar after the tattoo became infected, and Salazar returned half of the $60 Roque had paid for the tattoo without further disagreement. (Salazar Dep., Ex. D to 56(a)1 Stmt. at 48:9–54:11.) According to Theresa

2

Lantz, prison staff were unaware of this conflict until after September 2, 2005 (Lantz Dep., Ex. O to 56(a)1 Stmt. at 48:18–49:1; Lantz Report at 6), which Plaintiff admits (56(a)2 Stmt. ¶ 10.) Mr. Salazar testified that prior to becoming cellmates they had "normal" run–ins in the prison yard, such as "talking smack" (Salazar Dep. at 48:9–19), but also that during their time as cellmates, prior to September 2, 2005, there were never any physical confrontations between he and Mr. Roque. (*Id.* at 55:3–55:12.)

William Zegarski, who works at USP Lewisburg as a case manager, states in his declaration that although he does not recall who made the cell assignment of Roque and Salazar, generally, after an inmate is released from SHU, "he would meet with the Unit Classification Committee consisting of the housing Unit Managers, an Associate Warden, Captain, [and] SIS representative to discuss and review his central file, incident offense, institution history, [and] reason for transfer to USP Lewisburg in an effort to determine if there were unforeseen threats to his safety that may exist within the general population." (Zegarski Dec., Ex. E to 56(a)1 Stmt. ¶ 5.) Mr. Zegarski also states that inmates could request to live with a particular roommate, either verbally or in writing, and "[i]f both inmates desired the move then the move would have been effectuated." (*Id.*) Nothing in Roque's file indicates that he complained about being assigned to a cell with Mr. Salazar. (56(a)1 Stmt. ¶ 25; 56(a)2 Stmt. ¶ 25.)

Mr. Salazar testified that prior to Roque and Salazar being moved to a cell together, a member of the Netas, a gang to which Roque belonged, named Itche approached Salazar and asked him if it would be okay if Roque moved into a cell with him; Salazar agreed to the arrangement. (Salazar Dep. at 46:17–48:2.) Salazar was "affiliated" with another gang while he was at USP Lewisburg, the Surenos, but testified that the Netas and Surenos had a good

relationship during his time at the prison. (*Id.* at 30:20–34:20.) Mr. Roque was transferred into Salazar's cell on July 29, 2005. (Zegarski Dec. ¶ 3.)

Corrections officers at USP Lewisburg are trained on the use of force and utilize a "Use of Force Model" in gauging the appropriate reaction to incidents with inmates. (Ex. B to 56(a)1 Stmt. at 604; Smith Dep., Ex. C to 56(a)1 Stmt. at 97:20–98:8.) Officers are also trained on how to respond to medical emergencies; they are taught not to enter a cell in the event of a medical emergency until the cell is secure and a lieutenant has arrived at the cell. (Myers Dep., Ex. I to 56(a)1 Stmt. at 22:8–18.)

B.     September 2, 2005 Incident

Mr. Salazar testified that on September 2, 2005, the cell he shared with Roque was locked down for the night at about 9:00 p.m.; at about 9:30 p.m., Roque told Salazar that he wanted to pray and turned off the light. (Salazar Dep. at 68:6–69:13.) Salazar fell asleep soon thereafter, but woke up when he was hit in the head, and saw blood on the wall near the head of his bed. (*Id.* at 69:14–70:12.) He testified that they began fighting; Roque bit Salazar's forearm, they started punching one another, and Roque bit Salazar's cheek. (*Id.* at 70:15–71:22.) According to Salazar, Roque grabbed a padlock and tried to hit him with it; Salazar hit Roque in the head with a full can of Sprite and put him in a chokehold. (*Id.* at 71:23–73:7.) Salazar held him in the chokehold for "maybe a minute" and let him go when he "smelled [Roque] release his body fluids." (*Id.* at 73:8–74:11.) The inmates in the adjacent cell yelled "what's going on over there?" and Salazar told them that Roque had attacked him. (*Id.* at 74:4–22.) Salazar saw that Roque wasn't moving, and told the adjacent inmates "I guess we're gonna have to kick the doors," at which point other inmates on the

4

floor began yelling and "kicking doors" to get the corrections officers' attention. (*Id.* at 74:23–75:6.)

A corrections officer responded to the cell and Salazar told him that he needed medical attention; Salazar testified that the officer then "took off running down the tier [and] pushed the panic button." (*Id.* at 75:21–76:21.) Officer Young prepared a memorandum entitled "cell fight," in which he indicates that he arrived at the cell at approximately 12:30 a.m., saw Salazar standing at the door and Roque sitting up in the corner; Salazar told him that they were fighting, and he went to "go call control." (Ex. B to 56(a)1 Stmt. at 555.) Eight additional officers responded to Roque and Salazar's cell, including Lieutenant Bergen, who told Salazar to put his hands through the food slot to be cuffed; Salazar complied. (*Id.* at 55, 555; Salazar Dep. at 79:16–80:7.) The officers opened the cell door to remove Salazar, and then closed the cell again. (Ex. B to 56(a)1 Stmt. at 55, 555; Salazar Dep. at 80:1–7.) Lieutenant Bergen instructed Roque to come to the door; he did not comply and after the order was repeated several times, Lieutenant Bergen sprayed him with pepper spray. (Ex. B to 56(a)1 Stmt. at 55, 555.) When Roque still did not respond, Lieutenant Bergen had a "Use of Force team" enter the cell, put Roque in restraints, and place him on a stretcher. (*Id.*)

Douglas McClintock, an Emergency Medical Technician, was a member of the Use of Force team that responded to Roque's cell. (McClintock Dep., Ex. M to 56(a)1 Stmt. at 21:22–22:4.) Mr. McClintock did not bring any medical equipment with him in responding with the Use of Force team, and no medical equipment is stored near the area of Roque's cell. (*Id.* at 51:17–52:23.) The prison did not have a portable automatic external defibrillator ("AED"). (*Id.* at 52:7–23.)

5

Prior to having the Use of Force team enter the cell, Lieutenant Bergen called Captain John Oliver, his supervisor, at home to notify him of the "significant incident" and tell him that the team was going to enter the cell; Captain Oliver agreed with Bergen's plan. (Bergen Dep., Ex. J to 56(a)1 Stmt. at 44:15–46:1.) The extraction team entered Roque's cell, pinned him to the wall with a protective shield, and restrained his arms and legs. (*Id.* at 50:11–19.) Lieutenant Bergen did not see Mr. Roque move at all when the extraction team entered the cell and place the restraints on him. (*Id.* at 51:23–52:22.) The team carried Mr. Roque on a stretcher to the shower room at the end of his cell range, at which point Officer McClintock examined him. (McClintock Dep. at 34:4–23.) According to Officer McClintock, Mr. Roque had "life–threatening injuries" and was "pulseless and apneic and he needed definitive care at that point." (*Id.* at 37:14–38:8.) Officer McClintock determined that Roque was in cardiac arrest, and that the team "needed to get him to the urgent care room so we could initiate care." (*Id.* at 38:9–39:9.) He testified that it then took about thirty seconds to a minute to carry Mr. Roque to the Health Services Unit. (*Id.* at 39:10–20.) McClintock "again reassessed [Roque] for spontaneous respirations, . . . listened with a stethoscope to his heart for heart tones and . . . [o]bserved that his extremities were cold to the touch and pale . . . [and] [h]is head and chest were cyanotic." (*Id.* at 39:21–40:21.)

Officer McClintock testified that he attached defibrillation pads to Roque's chest and detected asystole, meaning that there was no electrical activity in Roque's heart. (*Id.* at 41:1–21.) McClintock did not attempt to defibrillate Mr. Roque because according to Advanced Cardiac Life–Support protocols, "you do not defibrillate asystolly." (*Id.* at 41:22–42:9.) According to Officer McClintock, he determined that Roque was clinically dead, and did not take any other lifesaving measures. (*Id.* at 42:4–9, 48:5–11.)

II.   Discussion[1]

The Government argues that it is entitled to summary judgment in its favor on Plaintiff's Complaint because 1) it did not breach its duties to Roque under the FTCA because it exercised reasonable care in housing Roque, supervising his cell, responding to the September 2, 2005 fight, having medical personnel and equipment available, and treating Roque after the fight; 2) the Government's medical response could not have been a proximate cause of Roque's death because he died before staff reasonably could extract him from his cell; and 3) the Government is shielded from liability for its housing of Roque and storage of medical equipment by the Discretionary Function Exception of the FTCA.

    A.    Duty of Care

Under 18 U.S.C. § 4042, the Bureau of Prisons shall "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States . . . and provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." The Government accordingly "owes a duty of reasonable care to safeguard the security of prisoners under its control." *Owens v. Haas*, 601 F.2d 1242, 1249 (2d Cir. 1979) (citing *United States v. Muniz*, 374 U.S. 150, 164–65 (1963).

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

### 1. *Decision to house Roque and Salazar together*

The Government argues that it did not violate its duty of care in housing Mr. Roque and Mr. Salazar together in a cell because there was no indication that they could not be housed together safely. Plaintiff argues in response that the Government breached its duty in housing the two together because they were members of "rival" gangs.

The Government breaches its duty of care if prison staff fails to keep two inmates separate even though it "knew or reasonably should have known of a potential problem between the two inmates." *Parrott v. United States*, 536 F.3d 629, 637 (7th Cir. 2008) (citing *Brown v. United States*, 486 F.2d 288–89 (8th Cir. 1973)) (holding that there were disputed issues of material fact as to whether prison officials should have known of a potential risk of violence between inmates Parrott and Gregory in putting them on the same work detail where the evidence supported an inference that Parrott had previously been separated from Gregory and there was "bad blood" between the two "for at least a year").

Other than the dispute over the tattoo that Salazar gave Roque, there is no evidence in the record here of any "bad blood" between the two, any history of fights or violence between them, or any risk of violence between them. With respect to the tattoo, Salazar testified that the disagreement took place in January or February of 2005, several months before they were place in a cell together, and that the conflict was resolved without violence. (Salazar Dep. at 48:9–54:11.) Before Roque was placed in Salazar's cell, a fellow member of the Netas, Roque's gang, approached Salazar and Salazar agreed to have Roque move in with him. (*Id.* at 46:17–48:2.) The Government and Plaintiff agree that nothing in Roque's file indicates that he objected to the placement. (Def.'s 56(a)1 Stmt. ¶ 25; Pl.'s 56(a)2 Stmt. ¶ 25.) Further, Theresa Lantz, retained by the Government as an expert, stated in her Expert

8

Report that "[t]here was no written, verbal or observable reason for staff to suspect that there was a conflict between inmates Roque and Salazar prior to September 2, 2005." (Lantz Report at 6.)

Plaintiff argues that the Government breached its duty in assigning Salazar and Roque to a cell because prison staff ignored their gang affiliations in making the assignment. However, beyond relying on a Wikipedia entry about the Netas, Plaintiff points to no evidence in the record that there was tension or a history of violence between the Netas and the Surenos. Plaintiff's briefing calls into question the gang–related training that prison staff at USP Lewisburg receive, but points to nothing in the record that supports his argument that the Government should have known about a potential problem between Roque and Salazar. Plaintiffs' counsel claimed at oral argument that although nothing in the record indicated that authorities at USP Lewisburg knew about the tattoo argument, prison staff should have known about that dispute, as well as the inmates' gang affiliations and the "potential explosiveness" of the situation created by housing them together. However, as the record shows that Roque and Salazar resolved the tattoo disagreement peacefully, and that Roque and Salazar, despite their gang affiliations, agreed to the celling arrangement, there is no evidentiary support for Plaintiff's claim that there was a potentially explosive situation of which prison staff should have been aware. Because there is nothing in the record, known or unknown by prison staff prior to the September 2, 2005 assault, which would have indicated a potential problem between Roque and Salazar, the Government is entitled to summary judgment in its favor on Plaintiff's claims that it breached its duty of care by celling Roque and Salazar together.

9

### 2.     *Supervising Roque's cell*

The Government also argues that it did not breach its duty to Roque in supervising Roque's cell or training staff to respond to emergencies. Plaintiff argues in response that the Government's surveillance was inadequate in that the prison video cameras could not see into the cells, prison staff was unaware of the fight until after it was over and other inmates began kicking their doors, and prison officials had permitted gang shot–callers to control the prison.

USP Lewisburg records reflect that on September 2, 2005, Corrections Officer Cotterall walked past Roque's cell at 9:14 p.m., and that staff "observed" the range for an official count at 10:04 p.m. and again between 11:54 p.m. and 12:01 a.m. (Ex. B to 56(a)1 Stmt. at 544.) Plaintiff nonetheless maintains that prison staff were "deaf and blind when it came to maintaining surveillance of prisoner activity within the cells other than during the momentary peeks they took directly into the front of any particular cell door while making their periodic rounds walking the ranges." (Opp'n at 9.) According to Plaintiff, the Government did not adequately surveil the cells at Lewisburg, and thus breached its duty to Roque, because it did not maintain constant video surveillance of the interior of the cells. (*Id.*) Plaintiff's counsel contended at oral argument that without constant observation of the interior of each cell prison staff had no way of knowing what was going on in any particular cell in between the walkthroughs and headcounts conducted during the night. The Government is not, however, "an insurer of the safety of a prisoner." *Jones v. United States*, 534 F.2d 53, 54 (5th Cir. 1976). Reasonable care to safeguard the security of prisoners does not include constant observation of the interior of each cell in Lewisburg.

Therefore, the Government is entitled to summary judgment in its favor on Plaintiff's claims that it breached its duty of care by inadequately supervising Roque's cell.

### 3. *Response to the fight between Roque and Salazar and care in medically assessing and treating Roque*

The Government argues that Lewisburg staff responded to the incident on September 2, 2005 in a timely manner in that an officer responded within one to one–and–a–half minutes and immediately called for assistance, additional officers responded within approximately fifteen seconds. The Government also argues that prison staff reasonably took steps to gain compliance of Roque prior to extracting him from the cell and treating him. Plaintiff does not respond to these arguments in his Opposition other than by arguing that the staff "bungled the medical response so badly that it was no more effective than having no medical response at all." (Opp'n at 11.) He does not point to any facts in the record that could demonstrate to a reasonable juror that after being alerted to the fight, corrections officers responded in an improperly slow manner. At oral argument, Plaintiff's counsel argued that during the response at the cell, the Lewisburg EMT should not have remained outside the cell while the Use of Force team extracted Roque. However, Plaintiff does not present any expert opinion that this procedure, which the Government maintains is necessary due to the limited amount of space in the cell, is contrary to any recognized standard of reasonable care.

Importantly, Plaintiff does not point to anything in the record that supports an argument that the Use of Force team responded in an inappropriate way to a violent situation or that there were reasonable alternative means of extracting Roque and providing medical care that would have struck the appropriate balance between prison staff safety and

11

the duty owed by prison staff to safeguard Roque's security. Nothing in the record supports Plaintiff's claim that prison staff "bungled" their response to the fight or the ensuing medical emergency. The Government is therefore entitled to summary judgment in its favor on Plaintiff's claims that it breached its duty to Roque in its responses to the September 2, 2005 incident.

### 4. *Availability and preparedness of medical personnel and equipment*

The Government also argues that prison staff "demonstrated medical preparedness in responding to Roque's cell" and that it was reasonable that no medical equipment was stored on the range. (Mem. Supp. at 27.) Plaintiff argues in response that the staff "was woefully unprepared to deal with the medical emergency situation" due to the fact that no medical equipment is kept on the cell ranges. (Opp'n at 11.)

Officer McClintock testified that the prison did not keep medical equipment on the ranges near Roque's cell, and that the prison did not have a portable defibrillator. (McClintock Dep. at 51:17–52:23.) However, McClintock also testified that after it was determined that Roque needed urgent medical care, it took only about thirty seconds to a minute to carry him to the Health Services Unit. (*Id.* 38:9–39:20.) Given the short amount of time that it took to bring Roque to the medical equipment in the Health Services Unit, and the absence of any evidence that having the equipment available within that period of time would have made a difference in Mr. Roque's outcome, Plaintiff has presented insufficient evidence from which the fact-finder could conclude that the Government breached its duty to Roque by having medical equipment in the Health Services Unit, rather than in the individual ranges.

B.  Proximate Cause and the Discretionary Function Exception

The Government also argues that it is entitled to summary judgment because its medical response could not have been a proximate cause of Roque's death because Roque died before prison staff extracted him from the cell and the discretionary function exception to the FTCA precludes liability with respect to the decision to house Roque with Salazar and the decision to store medical equipment in the Health Services Unit. Because, as discussed above, the Government is entitled to summary judgment that it did not breach its duty of care, the Court need not address the proximate cause and discretionary function exception arguments.

III.  Conclusion

For the reasons stated above, Defendant's motion [Doc. # 54] for summary judgment is GRANTED. The clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of February, 2012.